IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

OCTOBER 1998 SESSION

FILED

April 30, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. NO. 03C01-9803-CR-00117 |
| APPELLEE, | * | HAMILTON COUNTY |
| VS. | * | Hon. Stephen M. Bevil, Judge |
| EARL DEWAYNE HOLLOWAY, | * | (Second Degree Murder) |
| APPELLANT. | * | |

For Appellant:

Tom Landis
Doctors Building
Suite 327
744 McCallie Avenue
Chattanooga, TN 37403

For Appellee:

John Knox Walkup
Attorney General and Reporter

Ellen H. Pollack
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

Barry A. Steelman
Assistant District Attorney General
Courts Building
Suite 300
Chattanooga, TN 37402

OPINION FILED: _____

AFFIRMED

GARY R. WADE, PRESIDING JUDGE

## OPINION

The defendant, Earl Dewayne Holloway, was convicted of second degree murder. The trial court imposed a twenty-two-year sentence with a release eligibility at eighty-five percent of the term. <u>See</u> Tenn. Code Ann. § 40-35-501. In this appeal of right, the defendant poses the following question: "will a conviction for second degree murder stand where the defendant was the victim of an aggravated robbery by the deceased?"

We affirm the judgment of the trial court.

On September 5, 1995, Greg Vinson, a resident of the West Side housing project in Chattanooga, encountered the defendant and Elmonte Sims, who sat in a car parked in the College Hill Courts, a section of the West Side. When the defendant, who had known Vinson for several months, inquired whether anyone had drugs, Vinson responded that he did not know. At that point, the defendant and Sims left their vehicle and walked toward "the Cut," a narrow passageway between two tall apartment buildings. A short time later, Vinson saw two individuals pointing guns at Sims. The defendant was also present, but no one had pointed a weapon in his direction. The armed men quickly left "the Cut." The defendant and Sims remained. At that point, an individual named Reginald Hitchcock, who appeared to be unarmed, "just came out of the blue," approached Sims, and began to remove his rings. Vinson attempted to stop the robbery but, before he could intervene, the defendant shot Hitchcock in the back, thereby causing his death.

On cross-examination, Vinson acknowledged that he had "done drugs" with the defendant about a year-and-a-half to two years earlier. He also acknowledged carrying a beeper on the day of the shooting. He testified that the

2

entire incident took no more than two to three minutes.

Dubois Montrell Ross testified that he lived near "the Cut" and had witnessed the shooting of his friend, Reginald Hitchcock. Ross, who at the time of the shooting was with the victim's brother, Marlin Borgne, witnessed the robbery. He identified the robber as his cousin, Michael Franklin. Ross claimed that Franklin aimed a gun at Sims but not at the defendant. He testified that after Franklin left, Hitchcock, who was unarmed, entered "the Cut" and started removing Sims' rings. Ross recalled seeing Vinson push Hitchcock away from Sims and try to prevent the robbery. At that point, Ross saw the defendant come from around the corner, remove his weapon from his belt, and shoot Hitchcock in the back. Before leaving the scene of the shooting, the defendant pointed the gun at Vinson and Ross.

Ross stated that he saw Wayne Ware holding a "12-gauge ... in his hand." When Ross told Borgne his brother had just been shot, Borgne retrieved the gun from Ware and chased the defendant. When the defendant pointed the gun at Borgne, Borgne fired. The bullets struck the defendant's car.

Otis Smart, Jr., also witnessed the shooting. He recalled that he was walking home from the store when he saw the defendant "pull out a gun, put it to Hitchcock's back and sho[o]t it." Smart testified that the victim did not have a weapon.

Dr. Frank King, the Hamilton County Medical Examiner, performed an autopsy on the victim. He concluded that the victim died of a gunshot wound to the left upper back. Dr. King testified that the range of fire was at least one to two feet from the victim's body. Test results indicated the presence of cocaine, marijuana,

3

and alcohol.

Elmonte Sims, who had known the defendant for several years, was a witness for the defense. Charged with first degree murder for his role in the shooting, Sims acknowledged that his trial date had not been set. He recalled that when he arrived at the defendant's house on the day of the shooting, the defendant said that Vinson had been by and had arranged a "deal for some [crack cocaine]." When the three met at College Hill Apartments, Vinson told them he needed five hundred dollars but said they could pay when they were able. He recalled that Vinson then instructed them to return in thirty minutes because he was still "cooking up the drug."

Sims testified that he and the defendant returned to meet Vinson around 6:15 p.m., when a "bunch of guys jumped out from behind the building with guns." One individual approached Sims carrying a rifle. Sims recalled that he saw a shotgun, a small revolver, and a pistol with the trigger guard missing. He remembered that the person with the shotgun stole the money from his pockets. Sims, who admitted that he carried a gun with him at that time, testified that as one of the assailants held a small caliber weapon against the defendant's head, another held a weapon to his head. He claimed that Reginald Hitchcock then arrived, pointing a pistol at Sims and the defendant. Sims stated that Hitchcock then removed his necklace. When one of the assailants left the area, he passed his weapon to Michael Franklin. Sims testified that when Hitchcock ran towards him with the pistol aimed in his direction, the defendant intervened, shooting Hitchcock. Sims stated that he and the defendant then left the area as quickly as possible.

On appeal, of course, the state is entitled to the strongest legitimate

4

view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); Tenn. R. App. P. 13(e).

By use of these guidelines, we must conclude that the evidence is sufficient to support the defendant's conviction. At the time of the offense, second degree murder was defined as a "knowing killing of another." Tenn. Code Ann. § 39-13-210(a). Our code defines "knowing" as follows:

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-302(b).

The defendant argues that "as a matter of law this homicide cannot be more than voluntary manslaughter." He contends that the robbery qualified as "adequate provocation" and that he was in a justifiable state of passion when the shooting occurred.

The witnesses for the state, however, testified that the defendant pulled his weapon and shot the unarmed victim in the back at a close range. It was

5

the jury's prerogative to accredit the entire testimony and theory of the state that the victim was unarmed and not a threat to the defendant. The state witnesses testified that Sims was the victim of the robbery, not the defendant. That presented a factual issue. "When the evidence is conflicting, the jury must resolve these conflicts, under proper instructions, and decide whether the homicide is murder or manslaughter." State v. Robert Zandi, No. 02C01-9703-CC-00122, slip op. at 5 (Tenn. Crim. App., at Jackson, Jan. 15, 1998). Here, the trial judge provided instructions on manslaughter, self-defense, and defense of another. The jury rejected each of those alternatives and concluded the defendant had committed a "knowing killing" and was thus guilty of second degree murder. This court may not reweigh the evidence nor substitute its own view for that properly reached by the finder of fact.

Accordingly, the judgment of the trial court is affirmed.

_____
Gary R. Wade, Presiding Judge

CONCUR:


_____
David H. Welles, Judge


_____
Thomas T. Woodall, Judge