# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs December 9, 2014

## STATE OF TENNESSEE v. GARY D. SCALES

### Appeal from the Criminal Court for Davidson County
### No. 2013B1414    Cheryl A. Blackburn, Judge

### No. M2014-01094-CCA-R3-CD - Filed March 9, 2015

Defendant, Gary D. Scales, was indicted by the Davidson County grand jury for one count of robbery.  A jury found Defendant guilty of the charged offense, and the trial court sentenced Defendant to serve 15 years in the Tennessee Department of Correction as a Persistent offender.  Defendant appeals his conviction and asserts that the evidence was insufficient to support his conviction.  Having carefully reviewed the record before us, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, P. J., delivered the opinion of the Court, in which ALAN E. GLENN and TIMOTHY L. EASTER, JJ., joined.

James O. Martin, III, Nashville, Tennessee, (on appeal); and Andrew Beasley, Nashville, Tennessee, (at trial), for the appellant, Gary D. Scales.

Herbert H. Slatery, III, Attorney General and Reporter; Benjamin J. Ball, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### Background

At approximately noon on June 2, 2012, Charles Dubuisson was driving on Jefferson Street in heavy traffic when he witnessed Defendant grab the victim, who was walking with a cane, and take him to the ground.  He also noticed that Defendant put both hands in the victim's front pockets and took something out.   Defendant then "stood up, walked stiff

armed and looked around a few times, and then walked at a very fast pace away." Mr. Dubuisson testified that he watched Defendant walk past a tent toward the back of the Family Dollar building. Mr. Dubuisson also saw a white female with strawberry blonde hair who appeared to be with Defendant. Mr. Dubuisson used his cell phone to call police. He returned to the scene and spoke with an officer. Mr. Dubuisson later identified Defendant from a photographic line-up. He also identified Defendant at trial. Mr. Dubuisson testified that he attempted to identify the female from a photographic line-up. He picked out a photograph but later called police and told them that he had picked the wrong woman from the line-up. Mr. Dubuisson testified that he did not pay as much attention to the woman as he did Defendant at the time of the robbery. He was "very sure" of his identification of Defendant.

Officer Michael Evans of the Metropolitan Nashville Police Department testified that he was dispatched to a robbery call at approximately 12:15 p.m. on June 2, 2012, involving the victim, Sam Bolden. Officer Evans noticed that the victim appeared to be disheveled, and he thought that there was a cut on the victim's elbow so Officer Evans called for an ambulance. He said that the area was located "probably 150 yards west of the Captain D's" on Jefferson Street. Officer Evans knew the victim, and he testified that the victim usually walked with a cane. He said that the victim had been arrested from time to time for public intoxication and disorderly conduct. Officer Evans learned that four-hundred dollars was taken from the victim during the robbery. He also spoke with a witness at the scene by the name of Mr. Dubuisson. Officer Evans took a report and forwarded the case to a detective.

The sixty-six year old victim, Sam Bolden, testified that on June 2, 2012, he was eating at the Captain D's located "there at 10th, 11th and Jefferson" across from Taco Bell. He noticed that a cashier in the restaurant was threatening to call police on Defendant and Defendant's girlfriend, Bonnie Hall, because they did not pay for their food. He said that he had never seen Ms. Hall before but he had seen Defendant. Mr. Bolden told the cashier not to call police, and he paid for the couple's food. He noted that he had a "roll" of money on his person of approximately three or four hundred dollars.

Mr. Bolden testified that when he left Captain D's, he noticed Defendant standing behind the door, and Defendant began walking behind him. He said,

> And [Defendant] bear hugged me where I couldn't reach down in my pockets, and he couldn't reach his hand down 'cause he couldn't pull my roll of money out and he couldn't get a fist outta there, either. That's the only way he can get his hand out, and he couldn't get his hand out. So he tossed me on the sidewalk and I skinned my legs up. And so I had my cell phone with me and I called the police. And the police caught him down the street, down on 10th

and Jefferson down in that area. And they caught him and they brought him back up there. And so, yeah, that's him right there. That's him.

The victim testified that Defendant took the money out of his pockets while he was on the ground.

On cross-examination, the victim testified that he had frequently seen Defendant while walking up an down Jefferson Street. Concerning Defendant's identity, the following exchange took place:

Q.    Do you see the person who robbed you in court today?

A.    Do I see him? Uh, well. I, yeah.

Q.    What do you mean yeah?

A.    Yes, I see him. That look like him right over there. He's in the family.

Q.    When you say it looks like him - -

A.    He's in the family but, you know. He came, used to come up there and eat Larry's food and, you know, and sometimes spend the night up there, him and his old, his girlfriend. She's real tacky, on the tacky side. They stayed mostly, where he was telling Larry, he stayed at the mission.

Q.    You say he's in the family. What does that mean?

A.    He's kin to 'em.

Q.    Kin to who?

A.    To Larry.

Q.    Okay. Who's Larry?

A.    Larry's my friend. And Weasel. Our thing, me and Larry used to do, I used to go down to the mission and pick up people got [sic] a ID and that's all we needed. He give them, paid them twenty or twenty-five dollars to take it back inside the store and get, they don't give no cash

-3-

now less you got a receipt to that. It mostly be women's and children's clothes and men clothes, different ages and all that. And he used to pay them to go back inside the store and a purchase return. They give gift certificates. Well, we didn't want that gift certificate 'cause they don't give you no money back, and that gift certificate we didn't want.

\*　　\*　　\*

Q. Had you been drinking that day?

A. Had I been drinking?

Q. Yeah.

A. No. 'Cause Larry didn't want me, he wouldn't even mess with me when I'd been drinking. He said you so drunk, you've been drinking, we ain't going - -

THE COURT: Whoa, whoa, whoa, hold on, Mr. Bolden. Mr. Beasley, you might want to clarify what day you're talking about.

Q. Yeah. I'm talking about June the 2nd when you say this happened to you at Captain D's?

A. No. No. Me and Larry, we were doing our thing and he wouldn't even mess with me when I'd been drinking.

Q. So there was somebody else there with you?

A. Huh?

Q. There was somebody else there with you?

A. There was somebody else there with me?

THE COURT: Be specific about what date you're talking about.

Q. On June the 2nd, 2012, at Captain D's there was somebody else there with you?

-4-

A.     Somebody else with me?

Q.     Yeah.

A.     No more than what we took out there with us.

Q.     Well, who did you take out there with you?

A.     I think it was this guy that him and, well, I don't think it was a baby. But I know it was him. And we ate, he had a white Cadillac, and we filled that, we have about three or four people we pick out each time we went.

Q.     All right. So who else was with you at Captain D's?

THE COURT:     Mr. Beasley. Wait a minute. Mr. Beasley, you need to be very specific about what day you're talking about and make sure he understands that day you're talking about. Okay?

*     *     *

Q.     June the 2nd, 2012, what we're talking about in court today, who else rode out to Captain D's with you?

A.     Well, I know we had, uh, we had, I can't remember 'cause uh, uh, uh, uh, we had at least, uh, four people that we usually take, we have four people.

Q.     Okay.

A.     'Cause we paid something like $15 for a purchase return. All you gotta do is go in and get that gift certificate. And they ain't gonna give you no money 'cause we didn't have no receipts.

Q.     And one of the guys that went with you on June 2nd, 2012 is Larry?

A.     Yeah.

Q.     Okay. And you think Larry is related to that guy?

A.      Well, he was a Scales.  That's all I know.

Q.      Okay.  So Larry is also a Scales?

A.      He's supposed to had been one.

On redirect examination, the victim clarified that on the day of the robbery, he was at Captain D's alone.

Timothy Vansel is the manager of the Captain D's on Jefferson Street.  He testified that he had seen Defendant and Ms. Hall outside of the Captain D's on several occasions and on the street corners as he was leaving work.  He had also seen them selling the Contributor Newspaper.  On June 2, 2012, Mr. Vansel saw Defendant and Ms. Hall with the victim.  He said that the victim paid for the couple's food, and they sat together and ate.  He thought the three were in the restaurant for approximately one hour to one and a half hours.  Mr. Vansel spoke with police on June 3, 2012, and viewed a photographic line-up.  He identified Ms. Hall from the photographs.  Mr. Vansel also identified Defendant in court as the man that he saw eating with the victim and Ms. Hall on June 2, 2012.

Detective Robert Anderson of the Metropolitan Nashville Police Department was assigned to investigate the robbery in this case.  He spoke with Mr. Vansel and developed Bonnie Hall as a suspect in the robbery.  Detective Anderson put together a photographic line-up and showed it to Mr. Vansel who identified Ms. Hall as being involved in the robbery.  Detective Anderson did not have Defendant's name as a suspect at that time.  He later developed Defendant as a suspect and showed a photographic line-up to Mr. Dubuisson who identified Defendant as the person he saw robbing the victim.

Bonnie Hall testified that in the summer of 2012 she was dating Defendant, and they lived together at 415 Ireland Street.  She remembered the victim buying lunch for her and Defendant one day at Captain D's.  Ms. Hall testified that sometime later Defendant walked up behind the victim and grabbed the victim as he was walking away.  Defendant took the victim to the ground and robbed him.

Ms. Hall spoke with police a few weeks later but did not tell them that Defendant was the one who robbed the victim.  She was afraid that Defendant would lie and say that she took part in the robbery.  Ms. Hall testified that she told police the victim bought lunch for her and Defendant and that Defendant walked up behind the victim and hugged him afterwards. She told police that she did not see a robbery.

Defendant testified that he did not rob the victim and that he was working at the Pogue Market on June 2, 2012, "cleaning the lots" with Ms. Hall. He denied going to Captain D's. Defendant testified that he had a brother named Larry Scales who is now deceased. He referred to Larry Scales as his "twin." Defendant denied knowing Mr. Vansel, the manager of Captain D's, and he also denied selling "The Contributor" paper on Jefferson Street. However, he claimed that Mr. Vansel knew his brother Larry Scales. Defendant asserted that Ms. Hall was lying when she said that Defendant robbed the victim because she was "trying to get out of something."

On cross-examination, Defendant testified that although they were born two years apart, he and Larry Eugene Scales were "twins" because they looked alike. He said that Ms. Hall may have been at the Captain D's with someone else on June 2, 2012.

**Analysis**

Defendant contends that the evidence at trial was insufficient to support his conviction for robbery. More specifically, he asserts that "the proof did not sufficiently establish his identity as the person that robbed Sam Bolden." We disagree.

"When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *see also Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); Tenn. R. App. P. 13(e). "Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012); *see also State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. *See Wagner*, 382 S.W.3d at 297; *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). The jury, as the finder of fact, is responsible for assessing the credibility of the witnesses, deciding the weight to accord their testimony, and reconciling any conflicts in the proof. *See Wagner*, 382 S.W.3d at 297; *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). On appeal, this court cannot re-weigh the evidence or draw any inferences from it other than those drawn by the jury. *See Wagner*, 382 S.W.3d at 297; *Cabbage*, 571 S.W.2d at 835. A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of both. "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Dorantes*, 331 S.W.3d at 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). Robbery is defined as "the intentional or knowing theft of

property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401.

Defendant asserts that the proof was insufficient to establish his identity as the perpetrator of the robbery because the identification by Mr. Dubuisson, Ms. Hall, and the victim was not reliable. The identity of the accused as the person who committed the offense for which he is on trial is a question of fact for the jury. *State v. Williams*, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981). The identity of an accused may be established either by direct evidence, circumstantial evidence, or a combination of the two. *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999).

Viewing the evidence in a light most favorable to the State, the proof showed that on June 2, 2012, Defendant grabbed the sixty-six year old victim, who walked with a cane, and threw him to the ground. Defendant then reached inside the victim's front pockets and forcibly took four-hundred dollars in cash from the victim. Charles Dubuisson identified Defendant as the person that he saw grab the victim and take him to the ground. He witnessed Defendant put both hands in the victim's front pockets, remove something, and then walk away at a very fast pace. Mr. Dubuisson also noticed a white female who appeared to be with Defendant. He later identified Defendant from photographic line-up. Mr. Dubuisson admitted at trial that he incorrectly identified the photograph of the female with Defendant, and he later called the detective to tell him that he had identified the wrong person. Mr. Dubuisson testified at trial that he paid more attention to Defendant than he did the woman at the time of the robbery. At trial, he was "very sure" of his identification of Defendant.

Timothy Vansel, the manager of the Captain D's on Jefferson Street, testified that he saw Defendant and Bonnie Hall eating with the victim on the day of the robbery after the victim had paid for the couple's food. Mr. Vansel later identified Ms. Hall from a photographic line-up. Ms. Hall admitted at trial that she and Defendant were with the victim prior to the robbery. She also testified that Defendant walked up behind the victim and grabbed the victim as he was walking away. Defendant then took the victim to the ground and robbed him. Ms. Hall admitted at trial that she initially lied to police and told them that Defendant had hugged the victim but that she did not see a robbery. She was afraid that Defendant would lie and say that she took part in the robbery.

The victim testified that he was with Defendant and Ms. Hall at Captain D's on June 2, 2012, and that he had frequently seen Defendant while walking up and down Jefferson

Street. He identified Defendant in court as the person who robbed him. We acknowledge that there was testimony by the victim that he knew Defendant's brother Larry Scales and that he rode to Captain D's with Larry Scales and some other individuals. However, the victim clarified that he was alone in Captain D's before he bought food for Defendant and Ms. Hall, and the victim never testified that he was robbed by Larry Scales.

Based on the evidence presented a rational juror could conclude that Defendant committed the offense of robbery. It was the jury's prerogative to reject Defendant's insinuation that his deceased brother, Larry Scales, committed the offense. We conclude that the evidence was sufficient beyond a reasonable doubt to support Defendant's conviction. Defendant is not entitled to relief on this issue.

Based on the foregoing, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE