# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 23, 2013

## STATE OF TENNESSEE v. RAINA FISHER

**Direct Appeal from the Circuit Court for Maury County**
**No. 19513      Robert L. Holloway, Jr., Judge**

**No. M2012-00750-CCA-R3-CD - Filed July 3, 2013**

A Maury County Criminal Court Jury convicted the appellant, Raina Fisher, of three counts of theft of property valued $1,000 or more but less than $10,000, a Class D felony; one count of theft of property valued more than $500 but less than $1,000, a Class E felony; and one count of attempted theft of property valued $1,000 or more but less than $10,000, a Class E felony. The trial court sentenced her as a Range II, multiple offender to an effective sentence of seven years. On appeal, the appellant contends that the evidence is insufficient to support the convictions. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

William C. Barnes, Jr. (on appeal) and Larry Samuel Patterson, Jr. (at trial), Columbia, Tennessee, for the appellant, Raina Fisher.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Mike Bottoms, District Attorney General; and Kyle Dodd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

In February 2010, the Maury County Grand Jury indicted the appellant in counts 1, 2, and 3 for the thefts of property valued $1,000 or more but less than $10,000 that occurred

on August 20, August, 27, and September 15, 2009, respectively. The grand jury indicted the appellant in count 4 for the theft of property valued more than $500 but less than $1,000 that occurred on September 15, 2009, and in count 5 for the attempted theft of property valued $1,000 or more but less than $10,000 that occurred on November 6, 2009. At trial, Joseph Lee testified that he was a fraud investigator for Regions Bank. The State showed Lee a bank statement, and he identified it as a statement from Regions for the checking account of Chad A. Collier. The State introduced the statement, which showed the transactions for Collier's account from August 15, 2009, to September 15, 2009, into evidence as exhibit 1. On cross-examination, Lee testified that he had not looked at any other statements to see if payments had been made to Discover Card from Collier's account prior to August 15, 2009.

Jerry Lee testified that he was a field investigator for Discover Financial Services, also known as Discover Card. Brown identified Discover Card statements issued for transactions to the appellant's account in August and September 2009. The State introduced the statements into evidence as exhibits 2 and 3, respectively. According to exhibit 2, a "phone payment" was made to the appellant's account on August 10, 2009, in the amount of $1,310.54. Lee explained that a person could make a phone payment "over the computer, you just punch in the routing numbers, phone numbers, amounts. And then when you're all done, you hit confirm." He said a person also could make a phone payment by speaking with a Discover Card representative. For either method of making a phone payment, the payer would have to have the bank routing number and the bank account number from which the payment was to be made. If the payer wanted to make another phone payment, the payer would have to re-enter the banking information. According to exhibit 2, the appellant's August 10 phone payment was "returned" on August 13, 2009. Lee stated that the possible reasons for a phone payment's being returned were that "there's not finances in the [bank] account or the [bank] account being closed."

On cross-examination, Lee acknowledged that a person could make a phone payment by using the internet or a telephone. In this case, the appellant's August 10 phone payment was returned on August 13 because the bank account from which the payment was to be made was closed. Lee acknowledged that the appellant was not charged with a crime related to the August 10 phone payment, and he said that he did not know if phone payments were made to the appellant's Discover Card account prior to August 2009. Defense counsel showed Lee a document, and he identified it as the Discover Card statement issued for transactions to the appellant's account in October 2009. Defense counsel introduced the statement into evidence as exhibit 4. Lee acknowledged that according to exhibit 4, a "direct payment," as opposed to a phone payment, was made to the appellant's Discover Card account on October 10, 2009. Discover Card never opened a fraud case related to the appellant's account.

Chad Ashley Collier testified that he was thirty-nine years old and owned a civil engineering company in Brentwood. He and the appellant began a romantic relationship in late 2004 or early 2005, and they had a daughter who was five years old and in Collier's primary custody at the time of trial. Collier said that he and the appellant were together for about three years and that they lived in his home. The appellant did not work, and Collier paid their day-to-day expenses. Collier said that the appellant had very few expenses and that he "took care of them." If a bill needed to be paid, Collier wrote a check for it. He said that he and the appellant had a Citi Visa credit card and that the appellant could use the credit card to buy whatever she needed. The appellant would give the Citi bill to Collier, and he would pay it. Collier said that the appellant's "part of the account" was closed in October 2008 and that they "parted ways" in December 2008 or January 2009. They never had a joint checking or savings account while they were together.

Collier testified that he had a checking account at SunTrust Bank and that he paid all of his bills from that account. The appellant did not have access to the account. Collier also had a checking account at Regions Bank that he opened on July 24, 2008. The purpose of the Regions account was to pay for his daughter's nanny and some of his daughter's expenses. Collier did not remember ever giving his personal information to the appellant so that she could pay a bill over the telephone. He also never gave her permission to write checks from his checking accounts. In August 2009, the appellant moved into an apartment. Because their daughter stayed with the appellant sometimes, Collier reimbursed the appellant for buying their daughter a bed and some clothes. Collier wrote the reimbursement checks from his Regions account. He said that he did not monitor the account closely because he did not use it often and that he filed his bank statements without looking at them.

Collier testified that at some point, Regions notified him that his account was overdrawn. He said that he knew he was supposed to have about $12,000 in the account, that he began looking at the account "online," and that he was "greeted with this information." The State showed him exhibit 1, and he identified it as his Regions statement from August and September 2009. Collier said the statement showed four withdrawal transactions described as "Discover phone pay, Fisher, Raina." The first transaction occurred on August 20 for $3,127.68; the second occurred on August 27 for $4,263.54; the third occurred on September 1 for $820.49; and the fourth occurred on September 15 for $2,000. Collier said that he did not have a Discover Card, that he did not make the payments to Discover Card, and that he did not authorize the appellant to make the payments. On November 6, 2009, someone attempted to make another payment in the amount of $4,000 to $5,000, which caused Collier's Regions checking account to be overdrawn and resulted in Collier's receiving the overdraft notification. Within twenty-four hours of learning about the unauthorized transactions, Collier contacted the police.

-3-

On cross-examination, Collier acknowledged that when he met the appellant in late 2004 or early 2005, she was a dancer at Deja Vu and that he was a patron of the club. The appellant became pregnant in February 2005, and their daughter was born in December 2005. Collier closed his Regions checking account in November 2009. He acknowledged that according to exhibit 2, the appellant's Discover Card statement for August 2009, the appellant made a phone payment to her account on August 19 for $3,127.68, the same amount that was withdrawn from his Regions account on August 20. He also acknowledged that according to exhibit 1, his Regions statement, the first reimbursement check he wrote to the appellant was dated August 23, 2009, four days after the appellant's first phone payment to her Discover Card account. Collier said that the appellant had to get his bank information from "somewhere." Defense counsel asked Collier how the appellant obtained his bank information prior to August 19, and Collier stated, "She was . . . moving the rest of her belongings out of my house . . . between August 10th and August 20th, she very easily could have picked up a checkbook as she's walking out the door." He said he learned just before trial that the appellant also had made a phone payment in April 2009. Collier said that he would have had the appellant charged with theft for that unauthorized transaction if he had known about it and that he did not know how she got his information to make that payment.

Collier acknowledged that he filed for custody of their daughter on November 23, 2009, and that he was awarded custody based, in part, on his theft allegations against the appellant. He acknowledged that he never contacted the appellant to ask her about the transactions and that he had the police arrest her. He stated, "You could characterize our relationship as less than friendly." Collier acknowledged that he had used drugs previously but denied supplying the appellant with drugs while they were in a relationship. He also adamantly denied that he was still having sex with the appellant in August or September 2009. Collier may have told the appellant the day before trial that he was going to put her in jail. He said that Regions refunded his money several months before trial and that the appellant was employed for a short time during their relationship. At the conclusion of Collier's testimony, the State rested its case-in-chief.

The appellant, who was thirty-nine years old at the time of trial, testified that in 2001, she graduated from the University of Texas with a degree in psychology. The appellant met Chad Collier on August 16, 2004, while she was a dancer at Deja Vu and Collier was a customer of the club. They had a daughter in December 2005. The appellant said that she ended her relationship with Collier in October 2008 but that they continued to have "sexual contact" until August 28, 2009.

The appellant testified that in October 2005, she and Collier lived in his house. The appellant worked for Wilson County Youth Ranch as a residential counselor but had to resign due to her pregnancy. She worked for Dell Computers until six weeks before her baby was

born and went to work for the Department of Children's Services as a case manager six weeks after the baby was born. On March 13, 2007, the appellant was nearly killed in a car accident. She had extensive injuries, became addicted to pain medication, and received a $50,000 settlement for the accident in 2007. The appellant had been addicted to pain medications previously due to pain she experienced from endometriosis and colon cancer. During their relationship, Collier was aware of her addiction, and they used drugs together. He paid all of their expenses.

The appellant testified that in August 2009, she had a checking account at First Tennessee Bank. Defense counsel showed her a statement, and she identified it as her checking account statement for transactions to her account from July 2009 to August 2009. Defense counsel introduced the statement into evidence as exhibit 5. The appellant acknowledged that according to exhibit 5, she made a $10,000 deposit to her checking account on August 11, 2009. The statement also showed that she wrote two checks to her mother, Patty King, in the amounts of $2,000 and $1,300. The appellant said that she had been in a rehabilitation facility, that King had been paying her bills for her, and that the $1,300 check, dated August 11, 2009, was a reimbursement to King for a phone payment to the appellant's Discover Card account. The appellant acknowledged that according to exhibit 2, her Discover Card statement for August 2009, a payment was made to her account on August 10, 2009, for $1,320.54. The appellant made the phone payment but thought the payment was coming from King's checking account. The next day, she wrote the $1,300 reimbursement check to King and wrote "thank you" on the bottom of the check. She said that Collier never wrote her a reimbursement check for their daughter's expenses until August 23, 2009, and that she did not steal Collier's checkbooks or obtain his banking information. However, she acknowledged that the $1,310.54 phone payment to Discover Card came from his account.

The appellant acknowledged that she made additional phone payments to her Discover Card account on August 19, August 27, and September 15, 2009. She made the phone payments by telephoning Discover Card and speaking with a representative. At some point, she realized that the phone payments were not coming out of her First Tennessee checking account, so she spoke with Harry Dyer at the bank. She said she thought she spoke with Dyer in mid-September. The appellant acknowledged that according to exhibit 4, her Discover Card statement for October 2009, she made a direct payment in the amount of the $3,351.61 to her account on October 10. She said she made payment by writing a check from her First Tennessee checking account. The appellant tried to make a phone payment to her Discover Card account on November 6, 2009. She said she thought the November payment was coming from her First Tennessee checking account because her October 10 payment had come from that account; therefore, "that should [have been] the current . . . account on file."

The appellant testified that Discover Card charged back to her account the phone payments that came out of Collier's checking account. She said she currently owed Discover Card about $10,000 and was making payments of $500 per month. Collier never asked the appellant about the payments from his account, and the police arrested her on November 13, 2009. Collier filed a petition for custody of their daughter on November 23, 2009, and raised the allegations from this case in the petition. The judge awarded temporary custody of the appellant's daughter to Collier. The appellant acknowledged that the night before trial, she and the appellant were to "exchange" their daughter. She said Collier told her that if she did not have their daughter to him at exactly 5:00 p.m., he was going to have the Brentwood police arrest her "in addition to [her] going to jail today." On more than one occasion, Collier told the appellant that she stole from him. The appellant told him that he was a liar. The appellant said that she attempted to explain the circumstances to him but that he would not discuss anything with her. She said she did not intend to take money from him. She said that when she spoke with the Discover Card representative to make the phone payments at issue in this case, she did not have to give the representative any bank numbers or verify any numbers. She said Collier had paid her Discover Card bill previously but that she did not know if he had ever paid the bill from his Regions checking account.

On cross-examination, the appellant acknowledged that when she made the $10,000 deposit to her checking account on August 11, 2009, it brought her account balance to $10,687.31. That same day, the appellant wrote the $1,300 reimbursement check to her mother. She later learned that her August 10 phone payment to Discover Card for $1,310.54 did not come out of her mother's checking account. The State asked her, "What account did it [try to] come out of?" The appellant said that she assumed it tried to come out of Collier's account because his account "was on file from when Chad was previously paying my credit card. They keep all those accounts on file." The appellant made the August 10 phone payment by speaking with a Discover Card representative. She said that the representative asked her if she wanted to make the payment "using account ending in whatever the last four digits are" and that she said yes. She said that the August 10 payment was returned because Collier must have "called and told them to not pay with that account anymore and closed it."

The appellant acknowledged that she made the following additional phone payments to Discover Card: $3,127.68 on August 19; $4,263.54 on August 26; and $820.49 on August 31. Each time she made a phone payment, the Discover Card representative asked if the appellant wanted to make the payment from the account ending in 3913, and the appellant said yes. All of the phone payments came out of Collier's Regions account, but the appellant did not know that at the time. She said she did not know her checking account number "by heart" and, therefore, did not know that 3913 were not the last four digits of her account

number.[1]  However, about the first of September, the appellant received her bank statement and noticed that her phone payments were not being withdrawn from her checking account. Nevertheless, she made another phone payment to Discover Card on September 14 in the amount of $2,000.  Once again, the Discover Card representative asked if the appellant wanted to make the payment from the account ending in 3913, and she said yes.  She said that she spoke with her bank's manager about September 15 but that he "couldn't figure out why it wasn't coming out of my checking account."  She said that she decided to make her next two Discover Card payments by check because "obviously, Discover [Card] was making an error."  The appellant paid Discover Card $732.60 by check on September 16 and more than $3,000 by check in October.  She said she made frequent payments to Discover Card because "I don't like to have a balance on my credit card, like the interest rate."

The appellant acknowledged that after making two payments by check, she "went back to the phone payment" in November.  She also acknowledged that the Discover Card representative again asked her if she wanted to make the November payment from the account ending in 3913 and that she again said yes.  She said that although she knew there was a problem with the phone payments not coming out of her account, she made the phone payment in November because "the last account they would have had on file would be from the [October] check I just wrote them."  She said that Discover Card had Collier's checking account information on file because he had made payments to her account from his checking account previously and that "that's the only way they could have had it."  She said that the last time Collier paid her Discover Card bill from his Regions account was mid-2009 and that he gave her authorization to use his bank account information to pay bills by telephone during their relationship.  The appellant acknowledged that she was convicted of obtaining drugs by fraud in November 2006 and attempting to obtain drugs by fraud in December 2006.

Harry Dyer, a financial services representative for First Tennessee Bank, testified that the appellant came into the bank on September 9, 2009, and asked him to "pull up" the recent transaction history for her checking account because her check register was "out of whack." Dyer needed more information for the appellant's account, so he ordered some of her past bank statements.  Two days later, the appellant brought her check register to Dyer, and they tried to balance her checkbook.  The appellant thought that some deposits to her account had not posted or that she had forgotten to write down something in her check register.  However, she and Dyer could not figure out the appellant's mistake.  On cross-examination, Dyer testified that from September 11 to September 22, he tried to reconcile the appellant's check register with her bank statements.  The appellant returned to the bank on September 22, and Dyer informed her that he could not determine what had happened to her checkbook.

---

[1]Exhibit 1, Collier's Regions statement, shows that "3913" were the last four digits of his account number.  The account was subsequently closed.

Chad Collier testified on rebuttal for the State that if he ever paid the appellant's Discover Card bill, he would have done so by writing a check for it. He said that the appellant had no reason to use her Discover Card while they were together because he gave her the Citi credit card, which he paid in full every month. He said that their relationship ended in October 2008 and that he could "guarantee" he did not pay any bills for her after January or February 2009. Collier said that his conversation with the appellant the night before trial was "[v]ery contentious" because she informed him that she was going to be late returning their daughter to him. He stated that pursuing criminal charges against the appellant gave him a better "position" in their custody dispute but that he also was "trying to do what's right" because the appellant "did something wrong."

The jury convicted the appellant as charged of three counts of theft of property valued $1,000 or more but less than $10,000, a Class D felony; one count of theft of property valued more than $500 but less than $1,000, a Class E felony; and one count of attempted theft of property valued $1,000 or more but less than $10,000, a Class E felony. After a sentencing hearing, the trial court sentenced her as a Range II, multiple offender to seven years for each Class D felony conviction and three years for each Class E felony conviction. The trial court ordered that the sentences be served concurrently to each other but consecutively to a prior sentence.

## II. Analysis

On appeal, the appellant contends that the evidence is insufficient to support the convictions because it is "clear" that the appellant made a mistake, tried to remedy the situation, and did not intentionally take money from Collier. The State argues that the evidence is sufficient because the jury heard the appellant's explanation and resolved all credibility determinations against her. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant

is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103. "[A] person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. 39-11-302(a). The jury may derive a person's intent from both direct and circumstantial evidence. State v. Washington, 658 S.W.2d 144, 146 (Tenn. Crim. App. 1983).

Taken in the light most favorable to the State, the evidence shows that the appellant made three phone payments to her Discover Card account from Collier's checking account. Although the appellant testified that she did not realize when she made the payments that the money was not coming out of her checking account, she stated that she authorized the Discover Card representatives to make the payments from the account ending in 3913, which turned out to be Collier's checking account. Moreover, although the appellant testified that she realized the payments were not coming out of her checking account in early September and spoke with Harry Dyer about the problem, she acknowledged that she made a fourth phone payment from the appellant's account and attempted to make a fifth payment. The appellant is arguing that the jury should have accredited her testimony that she did not know the payments were coming out of Collier's account. However, determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury clearly resolved the issue of credibility against the appellant. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). Therefore, we conclude that there is ample proof to sustain the appellant's convictions for theft and attempted theft.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE